[Civ. No. 39294. First Dist., Div. Three. Aug. 29, 1977.]

SUPERIOR STRUT & HANGER COMPANY et al.,
Plaintiffs and Respondents, v.
PORT OF OAKLAND et al., Defendants and Appellants.

988

## COUNSEL

Rogers, Vizzard & Tallet, John H. Tallet and J. Kerwin Rooney for Defendants and Appellants.

Brunn, Leighton, Miller & Rinehart, Rinehart & Schwartz and Gary R. Rinehart for Plaintiffs and Respondents.

## OPINION

**EMERSON, J.**[*]—The California Relocation Assistance Law, Government Code section 7260 et seq., (hereafter CRAL or the Act) provides in substance that a public entity which acquires real property for public use shall compensate a displaced person for relocation expenses and certain other losses. (Gov. Code, § 7262.)[1]

Respondent Superior Strut & Hanger Co., claiming to be a displaced person as defined in section 7260, subdivision (c), recovered judgment against appellant Port of Oakland (hereafter the Port). The judgment awarded relocation costs and also attorneys' fees. The Port appeals.

Prior to December 3, 1968, respondent, a manufacturing company, was the tenant in a building owned by the Oakland Dock and Warehouse Company. On that date, the Port acquired the property from Oakland Dock, for the purpose of developing it into a marine terminal facility. The Port, until such time as demolition of buildings would be required, elected to continue to rent the property to respondent. Accordingly, respondent and the Port entered into two "License and Concession Agreements" in April of 1969 and April of 1970.

Thereafter, respondent was offered a substitute location for lease by the Port. Respondent accepted this offer and on February 23, 1972, the parties executed a lease for this location (known as the Embarcadero Property). Respondent thereafter commenced plans to construct a new building on the Embarcadero Property. However, due to the subsequent discovery of an error in the description of the property given respondent

---

[*]Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

[1]Unless otherwise noted, all code section references herein are to the Government Code.

by the Port, it became necessary for respondent to redesign the building and resubmit bids to contractors. On April 11, 1972, respondent was served with a "Thirty Days' Notice Terminating Tenancy." However, due to the above-mentioned error and other factors, respondent was unable to move into the Embarcadero Property by May 11, 1972. The Port took no further action, except to urge that respondent move at the earliest possible date. On July 1, 1972, at the insistence of the Port, respondent executed a promissory note for $14,437.15 stated to be the damages suffered by the Port as a result of respondent's delay in vacating the premises. Respondent finally completed its move from the property on November 7, 1972. Although the Relocation Assistance Act was passed in 1971 and became mandatory upon public entities on July 1, 1972, the Port did not advise respondent of any rights to claim CRAL benefits. (See § 7261.)

On January 7, 1974, respondent filed a written claim for damages against the Port for "in excess of $100,000" as the result of relocation costs incurred in vacating the premises. On February 8, 1974, the Port notified respondent that the claim was rejected "because the claim is not a proper charge against the Board [of Port Commissioners], and claimant failed to present its claim to the Board within the time specified by law." Respondent thereupon instituted the instant action for breach of duty to pay relocation assistance costs and for damages.

The Port first argues that respondent failed to state a cause of action, since it never alleged that its displacement occurred as the result of an exercise of the power of condemnation. The premise underlying this contention is that the CRAL was intended to apply only to those persons displaced as the result of the exercise of the power of eminent domain. The Port cites *Redevelopment Agency* v. *Diamond Properties* (1969) 271 Cal.App.2d 315 [76 Cal.Rptr. 269], and *Concrete Service Co.* v. *State of California* ex. rel. *Dept. Pub. Wks.* (1969) 274 Cal.App.2d 142 [78 Cal.Rptr. 923], for the proposition that in order for a claimant to be entitled to compensation for fixtures and equipment, the property must be taken pursuant to the public entity's power of condemnation. However, these cases deal with an entirely different issue and were decided under California's Eminent Domain law, which is clearly separate in purposes and policies from the recently passed Relocation Assistance law. (See *City of Mountain View* v. *Superior Court* (1975) 54 Cal.App.3d 72, 77-81 [126 Cal.Rptr. 358].) In order to ascertain whether respondent's complaint stated a cause of action, it is necessary to examine the statutory provisions of CRAL itself. Such an examination

makes it evident that an actual exercise of the power of eminent domain is not a prerequisite to relocation benefits.

Government Code section 7260, subdivision (c) defines a "displaced person" as "any person who moves from real property, or who moves his personal property from real property, as the result of the acquisition of such real property . . . by a public entity . . . or as the result of a written order from a public entity to vacate the real property, for public use." Subdivision (g) defines "public use" as "a use for which real property *may be* acquired by eminent domain." (Italics added.) ■ By use of the words "may be" rather than "is" the very language of the Act makes it manifest that the actual filing of a condemnation action need not take place for coverage to be applicable under the Act. It is common knowledge that a large proportion, perhaps even the majority, of acquisitions of real property by public entities for public use are effected by "open market purchases" from the owner, rather than by condemnation. Indeed section 7267.1 *requires* a public entity to make every reasonable effort to acquire the property by negotiation. ■ In view of these statutory provisions we think it clear that the Legislature did not intend that tenants who are displaced as the result of a purchase of real property for public use be denied relocation benefits, while such benefits are granted to those who are displaced as the result of acquisition by condemnation.

Moreover, the Port's view that a condemnation action is essential to the recovery of relocation benefits is contrary to the views expressed by both the California Law Revision Commission and the Attorney General of California. In urging that the relocation provisions of section 7260 et seq. be kept separate from the eminent domain statutes, the commission stated: "The relocation assistance provisions are applicable to acquisitions of property by public entities by *any* means, *including* eminent domain." (Cal. Law Revision Com. Rep., Recommendation Proposing The Eminent Domain Law (Dec. 1974) p. 1653.) The Legislature followed the commission's recommendation and kept the statutes separate. The Attorney General, in commenting upon the issue, states: "The entitlement of a person to relocation benefits comes into being when that person's property is acquired by a public entity for a public use. *The manner of the acquisition has no effect upon the right of a person to relocation benefits.*" (57 Ops. Cal.Atty.Gen. (1974) p. 72, italics added.) We reject the Port's claim that an actual exercise of its power of eminent domain was necessary for the provisions of CRAL to come into play. It is indisputable that the property was acquired for public use, which is all that is required by the Act.

The Port next advances a series of arguments to the effect that respondent is not, as a matter of law, eligible for relocation benefits under CRAL. We discuss the contentions seriatim.

1. *Respondent's status as a tenant.*

This contention is intermingled with the point described above, in that the Port claims respondent was required to relocate not because of the Port's exercise of the power of eminent domain, but as the result of "a notice to vacate . . . given by a landlord to a tenant in the ordinary course of terminating that relationship." It is urged that respondent was not a "displaced person" but a mere tenant. The Port's argument amounts to an assertion that, if, following the acquisition of real property for public use, a public entity chooses to continue to rent the property to the tenants already residing therein for an interim period before the planned development commences, such tenants by virtue of entering into a lease with the entity forfeit all eligibility for relocation payments upon their compelled removal from the property for public use. Thus, the Port argues that respondent "waived" its rights to any compensation by entering into the leases with the Port and that the failure to provide for relocation benefits in the leases is indicative of an intention by the Port not to grant relocation costs.

■ Again, the provisions of CRAL itself refute the Port's assertion. Section 7260, subdivision (a) defines a "public entity" as including any ". . . public authority . . . *when acquiring real property,* or any interest therein, in any city or county for public use." It is thus clear that the acquisition of real property for public use is the triggering event. Section 7260, subdivision (c) defines a "displaced person" as "*any* person who moves from real property . . . as a result of the acquisition of such real property, in whole or in part, by a public entity . . . or as the result of a written order from a public entity to vacate the real property, for public use." As shown above, it is indisputable that the real property occupied by respondent was acquired by the Port in 1968 for a public use. The record also establishes that at the time the Port acquired the property from Oakland Dock, it informed respondent that it would eventually demolish the existing buildings in order to build a marine terminal facility, but that it would continue to rent to respondent in the meantime. The eventual written order to vacate, which respondent received on April 11, 1972, was for the explicit purpose of taking over the site and initiating construction of the new public facility. Hence, respondent was required to move both as the result of acquisition of real property by a

public entity and as the result of a written order to vacate such property for public use. Therefore, as the trial court properly ruled, respondent was a displaced person under the Act. We cannot accept the Port's contention that its leasing of the property to respondent for an interim period could change this result. At trial, ample testimony from the heads of state and local agencies was presented, establishing that it is common practice for such agencies to rent existing structures to those residing therein prior to public development. These officials confirmed that relocation benefits are nevertheless paid to such tenants at the time demolition is required. To accept the Port's interpretation of the Act would mean that the vast proportion of tenants who are required to move due to acquisition of real property for public use, would be ineligible for relocation benefits simply because they continued to rent from the public entity in the interim. We cannot ascribe such an intent to the Legislature.

The Port's reply brief cites *Baiza* v. *Southgate Recreation & Park Dist.* (1976) 59 Cal.App.3d 669 [130 Cal.Rptr. 836], for the proposition that the CRAL does not apply to the landlord/tenant relationship. In *Baiza*, the public agency acquired property by grant deed on April 25, 1972. The agency advised the tenant that he could remain as a tenant on a month-to-month basis until August 1, 1972. The tenant ceased paying rent and on July 12, the agency notified him that he was three months in arrears. He was served with a three-day notice to pay rent or quit on July 28, 1972, and shortly thereafter, he vacated the premises. After holding that the tenant's petition for writ of mandate to obtain relocation benefits was properly denied because he failed to exhaust his administrative remedies, the Court of Appeal further noted: "In addition, having been advised that respondent had acquired title to the property and that he could if he so desired remain as a tenant of respondent, petitioner chose to become a tenant at an agreed monthly rental. Thereafter, having failed to pay the rent and having been given a three-day notice to either pay the delinquent rent or quit the premises, he elected the latter course. He thereby forfeited his status as a 'displaced person' (Gov. Code, §§ 7261, subd. (a); 7262). His removal from the property was not the result of 'acquisition,' or a 'written order from a public entity to vacate the real property for public use' (Gov. Code, § 7260, subd. (c)), but the result of his breach of a landlord-tenant agreement." (*Id.,* at p. 674.)

The instant case is distinguishable from *Baiza* in that respondent's move was not the result of a breach of the landlord/tenant agreement. ■ The Port assertion that after May 11, 1972, respondent was

"unlawfully holding the property" is controverted by the record. Respondent's president, John Biggane, testified that respondent continued to pay rent up until and for two months after the notice to vacate. The Port took no action to remove respondent, but on the contrary the Port's deputy director, Walter Abernathy, indicated respondent could stay on. The Port not only agreed to and did accept a promissory note for $14,000 on account of damages suffered for the delay, but in fact billed respondent for rent owed for occupancy in the interim period, which amounts were paid by respondent. Where the lessor accepts rent from the lessee of real property beyond the expiration date of the hiring, the parties are presumed to have renewed the hiring. (Civ. Code, § 1945.) A tenant of real property cannot be guilty of unlawful detainer unless he holds over without the permission of his landlord. (Code Civ. Proc., § 1161, subd. 1.) The only reasonable inference that can be drawn from the evidence presented is that the Port acquiesced to continued occupancy by respondent and that such occupancy was with the Port's consent. Furthermore, even had the Port not consented to continuation of respondent's tenancy, its mere 30-day notice of cancellation could not have rendered respondent's continued possession "unlawful." Since respondent's original possession was lawful, its continued possession beyond the expiration of its term would merely have been a tenancy at sufferance (see 30 Cal.Jur.2d, Landlord and Tenant, § 44, pp. 170-171) and as such respondent "will be presumed to continue under lawful title" unless the owner takes some action to render the possession tortious. (30 Cal.Jur.2d, *op. cit. supra*, p. 171.)

■ We conclude that the trial court was correct in holding that respondent was a "displaced person" under the Act. Respondent's move was the direct result of both the Port's acquisition of the real property and its notice to vacate the property for public use. Unlike *Baiza*, the displacement did not come about as the result of any collateral breach of the landlord/tenant agreement.

2. *Effective date of the Act.*

The Port also contends that respondent could not be eligible under the CRAL, because the mandatory provisions of the 1971 Act did not become effective until July 1, 1972. It points out that the property was acquired in 1968 and that by May 11, 1972, respondent's tenancy had expired and it was required to vacate the premises. Since the mandatory payment provisions have no retroactive application (*Parking Authority* v. *Nicovich* (1973) 32 Cal.App.3d 420, 424-425 [108 Cal.Rptr. 137]), the Port

claims that respondent acquired no right to relocation payments. In answer, respondent asserts (1) that the mandatory payment provisions became effective on March 4, 1972, and (2) that the controlling date for determination of eligibility is the date of the move.

We cannot accept the first of respondent's contentions; namely, that the mandatory provisions became effective on March 4, 1972. Prior to the CRAL legislation of 1971, section 7262 provided, in pertinent part, that "As a part of the cost of acquisition of real property for public use, a public entity *may* compensate a displaced person for his actual and reasonable expense in moving. . . ." (Stats. 1969, ch. 1489, § 1; italics added.) Thus prior to the 1971 amendments, relocation assistance payments were within the discretion of the public body. (*Parking Authority* v. *Nicovich, supra,* at p. 425.) In 1971, the amendatory provisions of CRAL were passed providing that the public entity "*shall* compensate a displaced person . . . etc." making relocation payments mandatory. However, section 30 of the Act (originally Assem. Bill No. 533), further provided: "(a) Notwithstanding the amendments to, and repeals of, various provisions of law with respect to relocation advisory and financial assistance effectuated by this act, a public entity may, until July 1, 1972, continue to render such assistance in accordance with such provisions as they existed prior to being amended or repealed by this act. [¶] (b) Commencing on and after July 1, 1972, such assistance shall be rendered in accordance with this act." (Stats. 1971, ch. 1574, p. 3164.) We conclude that the reasonable interpretation of section 30, and the only one which makes it nonsuperfluous, is that the Legislature intended that notwithstanding the new provisions, public agencies could, at their discretion, continue to follow the permissive provisions of the law as it existed before the Act or as it is contained in the Act, but that after July 1, 1972, relocation assistance should become mandatory. As explained in a recent commentary on the legislation, this provision was apparently included as an accomodation to public entities opposed to the mandatory nature of the bill, who felt that many existing public projects would be abandoned for lack of sufficient funds. (Comment, *Relocation Assistance in California: Legislative Response to the Federal Program* (1972) 3 Pacific L.J. 114, 139.) By delaying the mandatory assistance provisions until July 1, 1972, the Legislature thus provided for a "grace period" in which projects could be continued without mandatory relocation payments. We therefore concur with the court's holding in *Parking Authority* v. *Nicovich, supra,* 32 Cal.App.3d 420, 424-425, that relocation assistance payments did not become mandatory upon public entities until July 1,

1972. (Accord, *Baiza* v. *Southgate Recreation & Park Dist.*, *supra*, 59 Cal.App.3d 669, 671.)

We do, however, agree with respondent's second contention that the operative date for eligibility under CRAL is the moving date of the displaced person. Initially, we reject the proposition that displaced persons are not entitled to relocation payments unless the real property which they occupy is *acquired* after July 1, 1972. In *Baiza*, the trial court so found and the Court of Appeal assumed "without so deciding that the trial court erred on this finding. . . ." (59 Cal.App.3d at p. 673.) Such a determination does appear to be in error, for the Legislature has defined a displaced person as one who moves "as a result of the acquisition of such real property . . . *or* as the result of a written order . . . to vacate the real property, for public use." (§ 7260, subd. (c); italics added.) By use of the word "or" it may be inferred that the Legislature intended persons who are required to vacate because of public development to be entitled to relocation benefits, whether the actual acquisition took place before the effective date of the Act or afterwards.

It is further clear that the Legislature intended that a person's eligibility for relocation benefits not accrue until that person is actually "displaced." "Displaced person" is defined as one "who moves" (§ 7260, subd. (c)); public entities are required to provide relocation advisory assistance to persons, businesses or farm operations who are "displaced." (§ 7261.) Compensation payments are to be made only to persons "displaced," i.e., those who have "moved." (§§ 7262-7264.) In the instant case, the witnesses Gardner and McClure testified that state and local agencies consider a person eligible for moving costs only if and when he moves. We deem this to be the correct interpretation of the above provisions. We conclude, therefore, that section 7262 as it was amended in 1971 requires mandatory relocation payments to qualified persons who are displaced after July 1, 1972. Since respondent's move indisputedly occurred after this date, it was eligible for relocation benefits.

3. *The effect of Government Code section 7266 at the time of the Port's action.*

On January 7, 1974, when respondent first presented its claim to the Port, section 7266 of the Act provided: "Any person aggrieved by a determination as to eligibility for a payment authorized by this chapter, or the amount of the payment, may have his application reviewed by the

public entity, *and the decision of the public entity shall be final.*" (Stats. 1969, ch. 1489, § 1; italics added.)

Respondent's claim was denied on February 8, 1974. Effective February 28, 1974, the Legislature deleted the italicized language concerning the finality of the public entity's decision. (Stats. 1974, ch. 47, § 3.5, p. 102.) The Port now claims that at the time it rejected the claim its authority to determine respondent's eligibility under the Act was final and not subject to judicial review. We do not agree.

The Port denied respondent's claim on the dual grounds that respondent was not eligible under the Act and did not timely present its claim. These decisions involved the interpretation of a statute. It is settled that a person has a constitutional right to a judicial determination of questions of law such as those dealing with the interpretation and application of statutes. (5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 319, p. 3616.) Our Supreme Court has affirmed that the ultimate interpretation of a statute is an exercise of the judicial power which cannot, in the absence of a constitutional provision, be conferred upon any other body. (*Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 326 [109 P.2d 935].) It is the duty of the courts "when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively, even though this requires the overthrow of an earlier erroneous administrative construction." (*Id.*) In *Bodinson,* the court further declared that if a statute were intended to vest final authority in an administrative body to pass upon questions of law, it would clearly be unconstitutional. (*Id.*) Thus, if former section 7266 had vested final authority to interpret the provisions of CRAL in the public entity, it would have been constitutionally defective.

However, we need not declare that section 7266, as it existed on February 8, 1974, was unconstitutional. Since a construction of section 7266 vesting final authority as to questions of law in a public entity would be unconstitutional, and an unconstitutional construction of a statute is to be avoided if possible (*County of Los Angeles* v. *Legg* (1936) 5 Cal.2d 349, 353 [55 P.2d 206]), we conclude that the Legislature merely intended to vest final authority in the public entity only as to *questions of fact.* Further proof of the Legislature's limited purpose is evidenced by the Legislature's repeal of the finality language altogether, on February 28, 1974.

■ Thus, the Port's determination of the questions of law encompassed by respondent's claim was not final, and respondent was not precluded by former section 7266 from seeking judicial review.

The Port urges that the trial court should not have entertained respondent's complaint, since respondent did not seek a petition for writ of mandamus. The Port relies solely on *City of Mountain View* v. *Superior Court, supra,* 54 Cal.App.3d 72. In *Mountain View,* a defendant in a condemnation suit filed an amended answer alleging the city's wrongful denial of in-lieu moving expenses. (*Id.,* at p. 81.) The court held that the defendant's proper remedy for wrongful denial of relocation payments under CRAL was not by way of answer in the condemnation action, but by way of administrative mandamus in superior court under Code of Civil Procedure section 1094.5. (*Id.,* at p. 82.)

We note, initially, that the Port did not raise this point below. Contrary to the Port's claim in its reply brief, neither the demurrer, nor the motion for summary judgment, nor counsel's remarks at the outset of trial, nor the motion for judgment on the pleadings claim that respondent should have brought this action by way of administrative mandamus. To the contrary, the essence of the Port's position on the matter was that its decision was final and not subject to judicial review at all. As discussed above, such a contention was without merit. Where an objection to procedural defects in connection with the relief sought could have been presented in a lower court and the party fails to raise such an objection, he may not successfully raise the point on appeal. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 276, p. 4264; *Nanny* v. *Ruby Lighting Corp.* (1952) 108 Cal.App.2d 856, 859 [239 P.2d 885].) ■ Having permitted respondent to proceed by way of complaint for breach of duty and damages, and having thereby *allowed the statute of limitations for filing a complaint in administrative mandamus under section 1094.5 to run,* the Port may not now be heard to complain that respondent employed the wrong procedure.

■ As an alternative ground for our conclusion, under the facts of the case, respondent was not required to seek administrative review before filing its complaint in superior court. As pointed out in *City of Los Angeles* v. Decker (1976) 61 Cal.App.3d 444, 451 [132 Cal.Rptr. 188] (hg. den., Nov. 18, 1976), it may be fairly imported from the review provisions of CRAL that the public entity must provide for a hearing and the taking of evidence. It is equally clear that where the public body's

procedure is inadequate, the requirement of an exhaustion of administrative remedies is inapplicable. (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 182, p. 1046.) In *Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328 [124 Cal.Rptr. 513, 540 P.2d 609] (cert. den., 424 U.S. 943 [47 L.Ed.2d 349, 96 S.Ct. 1411]), the Supreme Court found that the city's procedure which provided merely for the submission of a grievance form, without the taking of testimony, the submission of legal briefs or resolution by an impartial trier of fact to be "manifestly inadequate" to handle a dispute between city employees and the city concerning an agreement over salaries, and held that the employees need not have pursued the administrative remedy. (*Id.,* at pp. 342-343.) Similarly, in *Sunnyvale Public Safety Officers Assn.* v. *City of Sunnyvale* (1976) 55 Cal.App.3d 732 [127 Cal.Rptr. 863] (hg. den., Apr. 22, 1976), the court held that an employer-employee regulation which did not provide for a hearing or taking of testimony but only for a final determination based on a recommendation by an advisory panel, rendered the administrative remedy ineffective. (*Id.,* at p. 736.) In the present case, at the time of respondent's claim, the Port's procedure provided for no testimony, no fact-finding determination and no opportunity to be heard on the part of claimant for relocation benefits. Respondent's claim was simply summarily denied at a meeting of Port commissioners. By failing to provide for any formal administrative procedure for adjudicating claims for relocation assistance, the Port was in noncompliance with section 7267.8 of the Act, which provides in relevant part that "All public entities *shall* adopt rules and regulations to implement payments and to administer relocation assistance under the provisions of this chapter." (Italics added.) By the Port's own admission, it did not adopt state regulations or guidelines for implementation of CRAL until March 6, 1974, after the Port had denied respondent's claim and respondent had filed its action in superior court. These guidelines mandate a grievance procedure providing for comprehensive administrative review, including a full explanation of the agency's determination, notification to the claimant of his right to a review thereof, and the opportunity for an oral presentation by the claimant or his attorney before a person not involved in making the initial determination. (See Relocation Guidelines, Guidance for Agency Implementation of California Relocation Assistance Act (Oct. 1973) pp. II-23 - II-26.) We thus conclude that the Port's failure to provide respondent with such basic procedures, such as the taking of evidence or the opportunity to be heard, rendered the exhaustion of administrative remedies requirement inapplicable to respondent. Since respondent was not required to pursue administrative channels in the first instance, its present failure to seek

review by administrative mandamus is obviously not improper. Respondent was fully entitled to seek original relief in the superior court.

The Port's final contention regarding respondent's eligibility for relocation payments is that respondent's claim was barred by the statute of limitations. Respondent's move occurred on November 7, 1972. Its claim against the public entity was not filed until January 7, 1974, or 14 months later. Section 911.2 provides that "A claim relating to any other cause of action [except for death or personal injury, etc.] shall be presented . . . not later than one year after the accrual of the cause of action." Thus, respondent's claim would appear to have been untimely.

However, section 7268 of the Act provides for guidelines to be promulgated by the Commission of Housing and Community Development for the implementation of CRAL. These guidelines, which public entities are required to adopt (§ 7267.8), provide that "applications for benefits under the Act are to be made within *eighteen months* from the date on which the displaced person moves from the real property acquired. . . ." (Relocation Guidelines, Guidance for Agency Implementation of California Relocation Assistance Act, *supra*, p. II-4, italics added.) Thus, under the guidelines which the Port was required to adopt, the statute of limitations for presenting applications for relocation payments is to be 18 months from the time of the move. ■■■ We do not think it just or fair to allow the Port's failure to adopt regulations (which included the 18-month limitations period) until 2 months after respondent's claim was presented, to accrue to the Port's benefit, since this failure constituted a violation of the Port's mandatory duty to adopt such guidelines.

Furthermore, as described above, respondent was not required to present a claim before the Port. ■■■ Thus the court below was entitled to consider the applicable limitations period as that established in the relocation guidelines. Since suit was filed on February 13, 1974, within 18 months after respondent's right of action accrued, the claim was not barred by the statute.

The Port next contends that the amount of damages awarded to respondent is not supported by substantial evidence. ■■■ It is settled law that an appellate court, in reviewing the question of whether a damage award is supported by the evidence, must view the evidence in the light most favorable to the respondent and must give him the benefit of every inference reasonably to be drawn from the record. (*Seffert* v.

*Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 508 [15 Cal.Rptr. 161, 364 P.2d 337].) An appellate court can only interfere when the evidence shows that the award was so disproportionate to any reasonable limit of compensation as to shock the conscience and suggest that the verdict was the result of passion, prejudice or corruption on the part of the trier of fact. (23 Cal.Jur.3d, Damages, § 152, p. 294; *Connolly* v. *Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 487-488 [319 P.2d 343].) In the instant case, respondent's moving cost figures were supported by the testimony of respondent's supervisor, an independent auditor and an experienced mover. Although some of the itemized costs were estimates based on a percentage of total costs over the moving period, the trial court was entitled to accept such estimates, since they came from those who had firsthand involvement with the moving. Reviewing the entire evidence and testimony in the record, it does not appear that the damage award was either unreasonable or excessive. The trial court's award was supported by substantial evidence and should not, therefore, be disturbed. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 248, p. 4240.)

 The Port's final argument is one with which we agree. It is contended that the award of attorneys' fees to respondent is erroneous. It is well settled that, unless provided for by statute or agreement between the parties, a court cannot award attorneys' fees. (Code Civ. Proc., § 1021; *Wisniewski* v. *Clary* (1975) 46 Cal.App.3d 499 [120 Cal.Rptr. 176].) The Act nowhere provides for an award of attorneys' fees to a party wrongfully denied relocation benefits. (See §§ 7260-7276.) Thus the award was beyond the authority of the court.

Respondent admits that it cannot point to any authority which would justify the award other than the case of *La Raza Unida* v. *Volpe* (N.D.Cal. 1972) 57 F.R.D. 94, where a federal district judge made such an award on the basis of the "private attorney general" theory, i.e., that courts will use their power to award attorney fees in order to insure the effectuation of a strong congressional policy. Respondent justifies the present award as an effectuation of the strong legislative policy behind CRAL of providing relocation assistance to displaced persons. However, as the Port points out, the United States Supreme Court has recently disapproved of the "private attorney general" theory and specifically, of the decision in *La Raza,* holding instead that federal courts are not free to fashion a judicially created exception to the long standing rule against the award of attorney fees in the absence of statute. (*Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240, 270-271, see also fn. 46 [44 L.Ed.2d 141, 160-161, 95 S.Ct. 1612].) Whatever the merits of the

"private attorney general" theory as previously formulated by the federal courts, it has no application in California and at any rate has now been disapproved by the United States Supreme Court. Therefore, the award of attorneys' fees in the present case was obviously improper and must be stricken.

The superior court is directed to modify the judgment by striking therefrom the award of attorneys' fees to respondent. As so modified, the judgment is affirmed. Each party shall bear its own costs on appeal.

Draper, P. J., and Racanelli, J.,* concurred.

A petition for a rehearing was denied September 28, 1977. Racanelli, J.,* was of the opinion that the petition should be granted. Appellants' petition for a hearing by the Supreme Court was denied October 27, 1977.

---

*Assigned by the Chairperson of the Judicial Council.