[Civ. No. 61890. Second Dist., Div. One. Aug. 4, 1982.]

STEVE STEPHENS et al., Plaintiffs and Appellants, v. WILLIS C. PERRY, as Director, etc., et al., Defendants and Respondents.

COUNSEL

W. Kenneth Rice, Twitchell & Rice, Adrian S. Andrade, Jeannie A. Barrett, Steven D. Belasco, Andrade & Belasco, Esther D. Martinez, Mary K. Gillespie and Vibiana M. Andrade for Plaintiffs and Appellants.

James Rozek for Defendants and Respondents.

OPINION

HANSON (Thaxton), J.—Plaintiffs Steve Stephens and Palma Estalio appeal the dismissal of their petition for a writ of mandate to compel defendants, the Directors of the Santa Maria Public Airport District and the Santa Maria Public Airport District (hereinafter referred to collectively as the District) to adopt a relocation plan and make predisplacement determinations as called for by the California relocation assistance law (Gov. Code, § 7260 et seq., hereinafter referred to as the Act) and implementing guidelines (California Relocation Assistance and Real Property Acquisition Guidelines, Cal. Admin. Code, tit. 25, § 6000 et seq., hereinafter referred to as the Guidelines.)

FACTS

Plaintiffs are two individuals who at one time owned mobilehomes and rented space for their mobilehomes from the operators of the Village Mobile Park (hereinafter referred to as the Park). The operators of the Park, in turn, had a master lease for rental of the land on which the Park was situated from its owner, the District. Plaintiffs did not move until sometime following termination of the master lease and after the Park ceased operation.

In their first amended petition for peremptory writ of mandate, plaintiffs, in substance, allege that they reside in the Village Mobile Park which is owned by the District; that the District is a public entity within the meaning of Government Code section 7260, subdivision (a); that upon the expiration date of the master lease, plaintiffs will be displaced and will have to relocate their residences on account of the District's acquisition of possession of the Park; that the District's intention of changing the area to something other than a residential area constitutes a use for a public purpose; that the District is required to make certain predisplacement determinations (Cal. Admin. Code, tit. 25, §§ 6010, 6038) and establish a grievance procedure (Cal. Admin. Code, tit. 25, § 6150 et seq.); that plaintiffs believe that were such relocation plan adopted by the District, the plaintiffs would be determined to be displaced persons pursuant to Government Code section 7260, subdivision (c), and entitled to relocation assistance benefits under the California Relocation Assistance Land Act; and that plaintiffs have no other adequate remedy available to them.

The parties filed cross-motions for summary judgment premised on underlying facts which were, in the main, stipulated and are essentially undisputed.

In 1942 the United States government acquired for use as an Army Air Force Base approximately 3,000 acres of land which now comprise the Santa Maria Public Airport (hereinafter referred to as the Airport). In 1949 the federal government conveyed this land and improvements to Santa Barbara County (hereinafter referred to as the County) for operation as a public airport.

In 1949 and 1950 the County by deed conveyed an undivided one-half interest in the subject land to the City of Santa Maria (hereinafter referred to as the City) with an agreement to participate in a joint ownership and operation of the Airport.

In January 1959 the City and County jointly leased approximately nine unimproved acres of the subject parcel to four individuals for the purpose of construction and operation of a mobilehome park. In 1962 this lease, which originally had a five-year term with an option to renew for four consecutive five-year periods, was amended to provide for its expiration on March 31, 1981.

When joint operation of the Airport was found to be unsatisfactory, the City and County decided to form an airport district pursuant to Public Utilities Code section 22001 et seq. The District was formed in September 1962. Thereafter in 1964 the City and County joined in conveying to the District all their right, title, and interest in the parcel on which the mobilehome park was situated, subject to the lessees' leasehold rights.

The individual tenants in the mobilehome park, including plaintiffs, rented their spaces on a month-to-month basis, and not all had written lease contracts.

In 1970 the successors to the original four individual lessee-operators of the Park obtained by mesne assignments the leasehold interest under the master ground lease. These successor lessees continued to operate the Park until March 31, 1981, at which time the master lease expired.

On February 14, 1980, the District made public its intention not to renew the master lease but to permit it to expire by its own terms. At the same meeting of the board of directors, the request of one of the tenants of the Park that she be permitted to lease and operate the Park as a sole lessee upon expiration of the ground lease was heard and denied. The individual lessee-operators vacated the premises on March 31, 1981. It appears that a written 12-month notice of lease termination was delivered to each tenant by the individual lessee-operators. Plaintiffs have each since the entry of summary judgment sold their mobilehomes, vacated the Park premises, and moved: Estalio to Stockton and Stephens to Lancaster.

The District in support of its motion for summary judgment filed, inter alia, the declaration of Everett Wallace Berry, general manager of the District who alleged, in substance, the facts relating to the historical development of the District and the construction of the Park heretofore set forth. Berry additionally alleged that the District has no plans for future use of the land on which the Park is situated; that the land is surplus to airport needs; that it is to be held currently and for the foreseeable future in reserve for future planning; that the land is zoned by the City for light industrial; and that the mobilehome park is a nonconforming use.

Following termination of the ground lease, residents of the Park continued to reside there without the consent or approval of the District. Certain park residents, other than plaintiffs in the case at bench, filed a

class action in the superior court of Santa Barbara against the same defendants as those in the present case. (Soto et al., v. Perry et al., case No. SM 33904.) The court on April 9, 1981, issued in that action a preliminary injunction enjoining the defendants from taking any action to evict any resident from the Park during the pendency of the action.

The court had before it these facts and was requested to take judicial notice of the Soto case pending when the hearing on summary judgment motions was conducted. Following argument, the trial court on February 10, 1981, on the basis of the entire record granted the District's motion for summary judgment, denied plaintiffs' motion for summary judgment, and dismissed the petition for writ of mandate.

## ISSUE

Plaintiffs contend that the trial court erred in granting summary judgment in favor of defendants since the facts show the District made an "acquisition" within the meaning of section 6008, subdivision (a), of the Guidelines and thus was required to prepare a relocation plan to assist persons in the position of plaintiffs who are "displaced persons" under section 7260, subdivision (c), of the Act.

## DISCUSSION

We conclude that, contrary to defendants' argument, the case at bench is not rendered moot by virtue of the fact that plaintiffs sold their mobilehomes and moved.[1]

Although plaintiffs concede their claims have thus been reduced to demands for relocation payments, it is clear this does not moot the controversy over their rights with respect to grievance procedures as required by section 6010, subdivision (a), of the Guidelines (*Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal. 2d 536 [63 Cal.Rptr. 21, 432 P.2d 717]). Moreover, the class action instituted by the other residents of the Park (Soto v. Perry, Santa Barbara Super. Ct. No. SM 33904) by complaint filed April 9, 1981, involves a similar controversy and a preliminary injunction issued in

[1]This appeal was noticed on February 26, 1981, and on that date, the District directors met and voted to institute eviction proceedings against all persons residing in the Park. On April 9, 1981, the California Supreme Court issued a writ of supersedeas to preclude such action against Stephens who still resided in the Park, Estalio having moved after the summary judgment issued. Stephens subsequently sold his mobilehome and moved to Lancaster.

that case has restrained the District from further proceedings to evict the remaining residents of the Park.

■ Plaintiffs contend that the trial court erred in determining that their petition failed to establish facts to support their claim that the District should prepare a relocation plan and grievance procedure pursuant to the Guidelines since there was no "acquisition" of land for public use. They argue that the court referred to the dictionary definition of "acquisition" when it should have looked to the interpretation of this term supplied by the Guidelines.

Section 7261, subdivision (a), of the Act states that "A public entity shall provide relocation advisory assistance to any person, business, or farm operation *displaced because of the acquisition of real property* for public use." (Italics added.)

In addition, the Act provides that as a part of the *cost of acquisition of real property for a public use*, the public entity shall compensate a "displaced person" [defined in § 7260, subd. (c)] for his moving expenses and losses (§ 7262), and shall make certain payments to the owner of the real property acquired, [§ 7263, subd. (a)], or to a "displaced person" displaced from a dwelling actually and lawfully occupied by such person for at least 90 days prior to "initiation of negotiations" for the *acquisition of the real property for a public use* [§ 7265, subd. (a)]. Under section 7267.8 of the Act, the public entity is also required to adopt rules and regulations to implement payments and to administer relocation assistance.

Section 6002, subdivision (e), of the Guidelines states that "The Act and the Guidelines are intended for the benefit of *displaced persons*, to insure that such persons receive fair and equitable treatment and do not suffer disproportionate injuries as the result of programs designed for the benefit of the public as a whole. The Act, Guidelines and all applicable regulations on which determinations are based shall be construed to effect this intent." (Italics added.) Section 6010, subdivision (a), of the Guidelines states that "No public entity may proceed with any phase of a project or other activity which will result in the *displacement* of any person, business or farm until it makes [certain] determinations...." (Italics added.)

The emphasis throughout the Act and Guidelines is on the class of people described as "displaced persons." Section 7260, subdivision (c), of the Act defines a "displaced person" as "... any person who moves from real property, or who moves his personal property from real prop-

erty, *as a result of the acquisition of such real property*, in whole or in part, by a public entity or by any person having an agreement with or acting on behalf of a public entity, or as the result of a written order from a public entity to vacate the real property, for public use...." (Italics added.)

Plaintiffs argue that the word "acquisition" with respect to real property is defined in the Guidelines section 6008, subdivision (a), as "obtaining ownership or possession of property by lawful means." Plaintiffs assert that this is definition of "acquisition" insofar as it refers to obtaining possession, and this they equate with the obtaining of actual physical possession. They argue that the District acquired the Park at expiration of the master ground lease because it then became entitled to physical possession of the premises.

The trial court, however, concluded on substantial evidence that no "acquisition" of real property occurred and as a consequence the District was not required to do anything with respect to tenants whose rentals of mobilehome spaces were terminated not by an "acquisition" but by the mere expiration of the master ground lease.[2]

In concluding that the District was required to do nothing insofar as relocation assistance was concerned, the trial court was guided by the fact that "the Act and the Guidelines are intended for the benefit of displaced persons ...." (§ 6002 (e) Guidelines.)

Under the Guidelines, the plaintiffs are not displaced persons unless their displacement occurred as a *result* of the acquisition of the real property by a public entity for a public use or upon a written order to vacate the real property for public use. The Act is applicable to public entities such as the District only when there are persons displaced by the acquisition. It is the causal connection between the acquisition and the displacement which brings into play the provisions of the Act and the Guidelines.

The reasoning of prior legal authorities supports the trial court's decision that plaintiffs in the case at bench failed to establish grounds for

---

[2]The court stated: "It would appear to me that the airport District has always had the interest that they will have, the right that they will have on March 31. They have had that I think from before the time of the lease, and the displacement will not be as a result of the acquisition of the real property.... The petitioners are persons who are or will be required to move from the real property. The problem I can't get past is whether the cause of their displacement has anything to do with the acquisition of the real property. I don't think the displacement is the result of the acquisition since that displacement occurs as a result of a lease termination."

issuing a writ of mandate to require the District to prepare plans or grievance procedures. Plaintiffs have referred this court to no legal authority, and we have found none, to support their assertion that the reversion of the right to possession of the land to its original owner (the District) constitutes an "acquisition" under the Guidelines.

The cases principally relied on by plaintiffs, both in their briefs and at oral argument, are inapposite since they deal merely with the rights of persons who were tenants of the original owner of land at the time of its acquisition (purchase or condemnation) by a public entity.

The foundation case is *Baiza* v. *Southgate Recreation & Park Dist.* (1976) 59 Cal.App.3d 669 [130 Cal.Rptr. 836] in which a public entity acquired real property which Baiza occupied as a tenant, and permitted Baiza to continue as a month-to-month tenant of the public entity until a specified date. Baiza thereafter failed to pay his rent; and after he was served with a three-day notice to pay rent or quit the premises, Baiza vacated the premises. The court held Baiza was not a displaced person because "His removal from the property was not the result of 'acquisition,' or a 'written order from a public entity to vacate the real property for public use' (Gov. Code, § 7260, subd. (c)), but the result of his breach of a landlord-tenant agreement." (*Baiza, supra*, 59 Cal. App.3d 669 at p. 674.)

Similarly, in the case at bench, the plaintiffs are not being displaced as a result of the acquisition of real property for a public use or a written order to vacate by a public entity for a public use but rather are being displaced as the result of the termination of the lessor-sublessee relationship (i.e., expiration of the master lease).

Plaintiffs refer also to *Superior Strut & Hanger Co.* v. *Port of Oakland* (1977) 72 Cal.App.3d 987 [140 Cal.Rptr. 515] in which Superior Strut occupied as a tenant a building on land acquired by the Port, a public entity, for a public purpose (a marine terminal facility). The Port continued the landlord-tenant relationship with Superior Strut until it was time to demolish the building, then served Superior Strut with "Thirty Days' Notice Terminating Tenancy." When Superior Strut did not vacate, the Port took no further action but accepted a $14,437.15 promissory note executed by Superior Strut to cover damages caused by the delay in vacating.

The court found that Superior Strut was a displaced person under the Act and distinguished the *Baiza* case because in *Superior Strut* the

landlord-tenant relationship was not terminated.[3] There was no issue with respect to "acquisition" in the case.

The District in the case at bench unlike the public entity in *Superior Strut* refused to accept any payments from tenants of the Park after the termination of the lease.[4] However, the District was prevented from evicting the plaintiffs since the plaintiffs obtained a writ of supersedeas from the California Supreme Court.

Finally, plaintiffs' position is not supported by the decision of *Albright* v. *State of California* (1979) 101 Cal.App.3d 14 [161 Cal.Rptr. 317]. Once again, in that case there was a clear cut acquisition of land by the State of California and the homeowners, who had previously held the land on long-term leases from a private party, sought replacement housing benefits as owner-occupants. The appellate court reversed the trial court's denial of writ of mandate concluding, inter alia, that the homeowners had not forfeited their eligibility for relocation benefits by entering short-term leases with the state. In *Albright* the fact of the acquisition by the state was beyond dispute, and the displacement was a consequence of that acquisition, not of the termination of the short-term leases.

---

[3]The court stated that "The Port assertion that after May 11, 1972, respondent was 'unlawfully holding the property' is controverted by the record. Respondent's president, John Biggane, testified that respondent continued to pay rent up until and for two months after the notice to vacate. The Port took no action to remove respondent, but on the contrary the Port's deputy director, Walter Abernathy, indicated respondent could stay on. The Port not only agreed to and did accept a promissory note for $14,000 on account of damages suffered for the delay, but in fact billed respondent for rent owed for occupancy in the interim period, which amounts were paid by respondent. Where the lessor accepts rent from the lessee of real property beyond the expiration date of the hiring, the parties are presumed to have renewed the hiring. (Civ. Code, § 1945.) A tenant of real property cannot be guilty of unlawful detainer unless he holds over without the permission of his landlord. (Code Civ. Proc., § 1161, subd. 1.) The only reasonable inference that can be drawn from the evidence presented is that the Port acquiesced to continued occupancy by respondent and that such occupancy was with the Port's consent...." (*Superior Strut & Hanger Co., supra*, 72 Cal.App.3d 987 at pp. 996-997.)

[4]"A tenancy at sufferance is said to arise when a person goes into possession of land lawfully and thereafter occupies without *any* title at all. For example, a lessee holding over against the lessor's consent after expiration of a lease for a fixed term is regarded as a tenant at sufferance, where the owner does not reenter .... A tenant at sufferance has merely a naked possession. He stands in no privity to the landlord, is not liable for rent unless expressly made so by statute, and is not entitled to notice to quit. He is, however, liable for the value of the use and occupation of the premises. The owner may put an end to such a tenancy and may, under certain circumstances, treat the possessor as an intruder or trespasser. But, since his original possession was lawful, he will be presumed to continue under lawful title, and unless the owner takes some action to render the possession tortious, such as by actual reentry, he cannot maintain an action of trespass." (42 Cal.Jur.3d, Landlord and Tenant, § 53, pp. 72-73.)

The interpretation of the Act by the superior court in the case at bench is supported by *Metropolitan Water Dist.* v. *Adams* (1948) 32 Cal.2d 620, 630 [197 P.2d 543]. There the court stated "... in the interpretation of statutes, when two constructions appear possible, this court follows the rule of favoring that which leads to the more reasonable result ...." If the interpretation of the Act which plaintiffs propose were adopted, every time a public entity entered into a fixed-term lease the lessee and any sublessees would be entitled to relocation assistance at the lease expiration. This would cover every type of lease from families in mobilehome parks to candy stores in airports. Such a holding would clearly expand the class of people entitled to relocation benefits beyond the legislative intent.

Plaintiffs claim that fear of such a result is unfounded since to claim assistance a "public use" must be shown and displaced persons must show they had no notice of the impending displacement. Section 7260, subdivision (g), of the Act defines public use broadly as "... a use for which real property may be acquired by eminent domain." As to notice, the tenant in *Superior Strut, supra,* 72 Cal.App.3d 987, entered the rental agreement with knowledge that it would have to vacate when the Port gave notice of intent to demolish the building yet the court held the company was entitled to relocation assistance despite having had notice.

In conclusion, the trial court correctly concluded that the displacement of plaintiffs was not the result of an acquisition of real property for a public use but was instead the result of the expiration of the master lease by its own terms. On this basis, summary judgment for defendants was appropriate.

### DISPOSITION

The judgment of the superior court granting the District's motion for summary judgment and dismissing the petition for writ of mandate is affirmed.

Lillie, Acting P. J., and Dalsimer, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 29, 1982.