[No. D003325. Fourth Dist., Div. One. Oct. 28, 1986.]

GEORGE F. BEATY et al., Plaintiffs and Appellants, v.
IMPERIAL IRRIGATION DISTRICT et al.,
Defendants and Respondents.

900

**COUNSEL**

Sutherland & Gerber and Randy J. Rutten for Plaintiffs and Appellants.

Jennings, Engstrand & Henrikson, Gregory V. Moser, Horton, Knox, Carter & Foote, Redwine & Sherrill, Frederick A. Bryson and Gerald Shoaf for Defendants and Respondents.

## OPINION

**STANIFORTH, J.**[*]—This case presents an issue of first impression: whether inverse condemnees are entitled to relocation assistance benefits under the Relocation Assistance Act (Act) (Gov. Code, § 7260 et seq.).[1]

### Facts

The petitioners (hereafter sometimes collectively referred to as Beaty) owned land which was flooded by the rising level of the Salton Sea. They brought inverse condemnation actions against the Imperial Irrigation District and the Coachella Valley Water District (Districts) alleging the Districts caused the flooding which resulted in a taking of property without just compensation.[2] While these suits were pending, the petitioners vacated their property and sought relocation assistance benefits from the Districts. The Districts denied their requests.

In December 1984, Beaty petitioned the superior court for a writ of mandate to compel the Districts to set aside their decisions denying benefits. The petition was denied and Beaty appealed.

### I

Under the Act a public entity "[a]s a part of the cost of acquisition of real property for a public use . . . shall compensate a displaced person" for moving expenses and other costs of relocating. (§ 7262.) A "displaced person" is defined, in pertinent part, as: "Any person who moves from real property, or who moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, by a public entity . . . for public use." (§ 7260, subd. (c).) "Public use" is defined as ". . . a use for which real property may be acquired by eminent domain." (§ 7260, subd. (g).)

---

[*]Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1]All statutory references are to the Government Code unless otherwise specified.

[2]Petitioners Mr. and Mrs. George F. Beaty and Mr. and Mrs. Walter F. Southard were plaintiffs in *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914 [218 Cal.Rptr. 839]. The remaining petitioners—Mrs. Katherine Hubenka, Mr. and Mrs. Clyde Jones, Sr., Mr. and Mrs. D. S. Waller and Beth I. Burdick as trustee for the estate of Luella B. Severe—were plaintiffs in *Anderson v. Imperial Irrigation Dist.* (D001587) appeal pending, argued August 14, 1986.█

Coachella Valley Water District has settled with the Beatys and Southards, including on the issue of relocation expenses.

■ The relocation assistance provided by the Act is separate from the "just compensation" required by the California and United States Constitutions. (*City of Mountain View* v. *Superior Court* (1975) 54 Cal.App.3d 72, 79-80 [126 Cal.Rptr. 358].)

## II

■ The fundamental rule of statutory construction is ascertaining the intent of the Legislature so as to effectuate the purpose of the law. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) The court looks first to the language of the statute, attempting to give effect to the usual, ordinary import of that language and seeking to avoid making any language mere surplusage. Significance if possible should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. (*Ibid.*) The various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) The provisions must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 170 [154 Cal.Rptr. 263]; *City of Costa Mesa* v. *McKenzie* (1973) 30 Cal.App.3d 763, 770 [106 Cal.Rptr. 569].)

## III

■ Beaty contends since the Act applies to a condemnee in an eminent domain proceeding, it also applies to a condemnee in an inverse condemnation action and a denial of relocation assistance benefits to inverse condemnees would be an arbitrary and capricious denial of equal protection.

■ Both eminent domain proceedings and inverse condemnation actions rest on the constitutional requirement that the government must provide just compensation to a property owner when it takes his or her private property for a public use. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19; *Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 866 [218 Cal.Rptr. 293, 705 P.2d 866], cert. den. 475 U.S. 1017 [89 L.Ed.2d 314, 106 S.Ct. 1200].) The principal procedural distinction between direct and inverse condemnation actions is that in a direct action the public entity takes the initiative while in an inverse action the property owner takes the initiative. (*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 43 [104 Cal.Rptr. 1, 500 P.2d 1345].)

The Districts argue there are significant substantive differences between the two actions. We agree there are some significant differences between direct and inverse actions, including: (1) inverse condemnation actions have evolved to include a broader scope of governmental activity than is traditionally included within the eminent domain power and (2) not all inverse condemnation actions result in an acquisition of private property by a public entity.

While, in eminent domain litigation, the focus is usually limited to the amount of compensation owed the property owner under the "just compensation" clause, in an inverse condemnation action, the property owner must first clear the hurdle of establishing the public entity has, in fact, taken his or her property before he or she can reach the issue of "just compensation." (*People* v. *Ricciardi* (1943) 23 Cal.2d 390, 400 [144 P.2d 799]; see also *San Gabriel Valley Water Co.* v. *City of Montebello* (1978) 84 Cal.App.3d 757, 769 [148 Cal.Rptr. 830].) As the court noted in *Taper* v. *City of Long Beach* (1982) 129 Cal.App.3d 590, 604-605 [181 Cal.Rptr. 169]: "The underlying consideration in an inverse condemnation action is the proper balance between the owner's private property rights and the public need for proper land use and fiscal planning and control. [Citations.] By contrast, in an eminent domain action, the public entity has already planned and decided to acquire the property and has instituted proceedings to do so, and the principal question is how much the property owner should have as 'just compensation.' [Citation.]"

■ To state a cause of action for inverse condemnation, the property owner must show there was an invasion or appropriation (a "taking" or "damaging") of some valuable property right which the property owner possesses by a public entity and the invasion or appropriation directly and specially affected the property owner to his injury. (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 119-120 [109 Cal.Rptr. 799, 514 P.2d 111]; *Rancho La Costa* v. *County of San Diego* (1980) 111 Cal.App.3d 54, 60 [168 Cal.Rptr. 491], cert. den. 451 U.S. 939 [68 L.Ed.2d 326, 101 S.Ct. 2020].)

In an inverse condemnation action, the property owner need not show the public entity intended to take or damage the property; inverse actions have been permitted when the invasion occurred as a result of negligence (see, e.g., *McMahan's of Santa Monica* v. *City of Santa Monica* (1983) 146 Cal.App.3d 683 [194 Cal.Rptr. 582] [damage from 51-year-old water main which had an expected life of 40 years]) or even when the public entity had absolutely no intent or "fault" (see *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129]) or lacks the power of eminent domain (see *Baker* v. *Burbank-Glendale-Pasadena Airport Au-*

*thority, supra,* 39 Cal.3d 862). As the Supreme Court has explained: "'"All that is necessary to show is that the damage resulted from an exercise of governmental power while seeking to promote 'the general interest in its relation to any legitimate object of the government.'"'" (*Baker* v. *Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d 862, 867.) The Supreme Court has also held an inverse condemnation action will lie regardless of whether the physical injury to real property was foreseeable or not so long as it was proximately caused by a public improvement as deliberately designed and constructed. (*Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, 263-264.)

■ Further, while an eminent domain proceeding contemplates a permanent acquisition of private property for a public use, an inverse condemnation action may be maintained for mere damage to property (see *Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648 [131 Cal.Rptr. 646, 552 P.2d 430]), for temporary invasions (see *Imperial Cattle Co.* v. *Imperial Irrigation Dist.* (1985) 167 Cal.App.3d 263 [213 Cal.Rptr. 622]) and even when the public entity does not physically possess the property (see *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285 [142 Cal.Rptr. 429, 572 P.2d 43] [sewage odors]; *Parker* v. *City of Los Angeles* (1974) 44 Cal.App.3d 556 [118 Cal.Rptr. 687] [airport noise]). Unlike an eminent domain proceeding, an inverse condemnation action does not always result in the public entity acquiring private property. (Contrast *Orme* v. *State of California* ex rel. *Dept. Water Resources* (1978) 83 Cal.App.3d 178 [147 Cal.Rptr. 735] and *Shaeffer* v. *State of California* (1970) 3 Cal.App.3d 348, 352 [83 Cal.Rptr. 347] with *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d 914, 962.)

Recently, in *Imperial Cattle Co.* v. *Imperial Irrigation Dist., supra,* 167 Cal.App.3d 263, we observed there were two different types of inverse condemnation cases: (1) those "which are merely a substitute for direct condemnation, that is, where the government has intentionally taken or damaged a citizen's property interest without prior payment," and (2) those cases where the damage is "neither intentional nor immediate" but "which can be molded into an inverse condemnation rubric . . . ." (*Id.* at pp. 273-274.) We observed the latter circumstance "appears very much to be a special specie of tort liability applicable only to the government." (*Id.* at p. 274, fn. omitted; accord *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d 914, 960-961.)

The distinction we made in *Imperial Cattle Co.* v. *Imperial Irrigation District, supra,* 167 Cal.App.3d 263, was in the context of an award of prejudgment interest, but we think the distinction is also relevant in the instant case.

The relocation assistance benefits of the Act are triggered when a person is "displaced" due to an "acquisition" of private property for a public use. Only some inverse condemnees are displaced, only some inverse condemnation actions result in an acquisition of private land by a public entity. Those inverse condemnees who are not displaced by the public entity's actions and whose property was not acquired by the public entity, therefore do not come within the purview of the Act. In other words, if the Act applies to inverse condemnees, it applies only to those whose action is a substitute for a direct condemnation action.

## IV

The Districts contend the Act does not apply to any inverse condemnees. They argue the Act applies only to planned, intentional takings such as negotiated purchases and direct condemnation. They point to various provisions in the Act which have no application in an inverse condemnation situation, e.g., the requirement the public entity give persons to be displaced at least 90 days notice (§ 7267.3), the public entity's right to solicit competitive bids for moving displaced persons (§ 7262, subd. (e)(2)), the requirement the public entity make every attempt to acquire the property by negotiation (§ 7267.1, subd. (a)), the requirement the public entity establish "just compensation" by appraising the property before beginning acquisition negotiations (§ 7267.1, subd. (b)). The Districts also point to the use of various terms in the Act which they argue show an intent not to extend relocation benefit assistance to inverse condemnees.

The Act does contain a number of provisions which do not apply in an inverse condemnation situation since such an action arises only after a public entity has taken the private property, after it has failed to take the initiative to provide just compensation either through purchase or instituting eminent domain proceedings. However, the fact the Act contains "planning" provisions does not compel a conclusion the Legislature intended to deny relocation assistance benefits to inverse condemnees whose action is a substitute for a direct condemnation action.

First, we observe nothing in the Act expressly excludes inverse condemnees from receiving relocation assistance benefits. Rather, the Act broadly defines "displaced persons" as "any person who moves from real property . . . as a result of the acquisition of such real property . . . by a public entity . . . for public use." (§ 7260, subd. (c).) This definition is broad enough to include inverse condemnees who are forced to move from their property because a public entity has taken possession of their property for a public use without first providing "just compensation."

Second, while the Act contains several provisions addressing steps the public entity should take, steps which can only be taken if the public entity is proceeding through purchase negotiations or eminent domain (e.g., providing notice and relocation assistance to persons before they are actually displaced), we disagree with the Districts' conclusion that therefore the Legislature intended benefits to be available only if the public entity was following the Act's procedures, i.e., negotiating a sale or initiating eminent domain proceedings.

The purpose of the Act is to provide fair and equitable treatment for the benefit of persons displaced by a public entity for a public use so that the displaced persons do not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole. Such a policy also underlies an inverse condemnation action. (See *Varjabedian* v. *City of Madera, supra,* 20 Cal.3d 285, 296-299; *McMahan's of Santa Monica* v. *City of Santa Monica, supra,* 146 Cal.App.3d 683, 697; *Yee* v. *City of Sausalito* (1983) 141 Cal.App.3d 917, 922 [190 Cal.Rptr. 595].)

This policy would hardly be furthered if the displaced person's right to benefits was dependent on the method by which the public entity acquired the property for a public use. Indeed, a contrary sentiment has been expressed by the judiciary, the California Law Revision Commission and the Attorney General. (See *Superior Strut & Hanger Co.* v. *Port of Oakland* (1977) 72 Cal.App.3d 987, 994 [140 Cal.Rptr. 515]; 12 Cal. Law Revision Com. Rep., Recommendation Proposing the Eminent Domain Law (Dec. 1974) p. 1653 ["The relocation assistance provisions are applicable to acquisitions of property by public entities by *any* means, *including* eminent domain" (italics added)]; 57 Ops.Cal.Atty.Gen. 70, 72 ["The manner of acquisition has no effect upon the right of a person to relocation benefits"].) Significantly, too, the Act was not made a part of the Eminent Domain Law. (Code Civ. Proc., § 1230.010 et seq.) (See *Superior Strut & Hanger Co.* v. *Port of Oakland, supra,* 72 Cal.App.3d 987, 994.)

Further, if the interpretation urged by the Districts were adopted, i.e., that a displaced person's right to benefits under the Act were dependent upon the public entity's actions in following the procedures of the Act, clearly unintended results could occur. For example, if the public entity failed to attempt to purchase the property before initiating eminent domain proceedings—thus violating section 7267.1 of the Act—under the Districts' analysis, the public entity would be justified in denying relocation benefits.[3]

---

[3]The Imperial Irrigation District makes a rather bizarre argument along these lines. It argues since the term "acquisition" as used in the Act means "[o]btaining ownership or possession of property by *lawful* means" (Cal. Admin. Code, tit. 25, § 6008, subd. (a),

Further, the adoption of the Districts' analysis would frustrate the Legislature's policy of encouraging acquisitions by negotiated purchase or eminent domain proceedings since the Districts' interpretation—denying benefits to inverse condemnees and thus saving public entities the cost of relocation assistance—would encourage acquisition by inverse condemnation.

The Coachella Valley Water District states: "It would be an absurd result for the Legislature, knowing that a public agency could not fulfill many of its obligations under the Act and Guidelines where inverse condemnation is involved, to intend for the Act to apply to such situations."

Such a statement begs the question. In the instant case, the question is not whether the public entity "could" have complied with the Act's provisions, but rather whether the Legislature intended relocation assistance benefits to be denied to persons displaced by the public entity's actions when the public entity *did not* comply. In the case before us, the Districts *could* have complied—they could have negotiated to purchase the property, they *could* have initiated eminent domain proceedings, but they *did not*.[4]

In our reading of the Act, we find no legislative intent to deny relocation assistance benefits to inverse condemnees because the public entity did not comply with the legislative provisions concerning negotiated purchases and eminent domain proceedings rather than inverse condemnation.

## V

The Imperial Irrigation District argues inverse condemnees are not entitled to benefits under the Act because the Act requires "public action."

The Imperial Irrigation District quotes from section 7260, subdivision (c), stating the "definition [of displaced person] shall be construed so that persons displaced as a result of *public action*" (italics added by Imperial

---

italics added), and since "[a] 'taking' by inverse condemnation is . . . 'a violation of the constitutional prohibition against the taking or damaging of private property for public use without just compensation,'" therefore such an "unlawful" inverse condemnation taking is not an "acquisition" within the meaning of the Act.

Beaty responds: "It would certainly be ironic for either [of the Districts] to argue that its actions in obtaining possession were unlawful. That fact would be akin to a situation where a woman is raped and a child is conceived. [The Districts] would have the argument proceed that because his act in raping the woman was unlawful, he is not responsible to pay for the child's support!" We think the analogy apt.

[4]The Imperial Irrigation District in the past has negotiated purchases of property surrounding the Salton Sea. (See *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d 914, 928.)

Irrigation District) and argues that while such public action clearly occurs under the Eminent Domain Law,[5] it does not in an inverse condemnation case.

First, we note the language quoted by the Imperial Irrigation District is quoted out of context. The full sentence reads: "This definition [of 'displaced person'] shall be construed so that persons displaced as a result of public action receive relocation benefits in cases where they are displaced as a result of an owner participation agreement or an acquisition carried out by a private person for or in connection with a public use where the public entity is otherwise empowered to acquire the property to carry out the public use." (§ 7260, subd. (c).) Thus, the Irrigation District is stretching its interpretation when it concludes the Legislature's choice of the phrase "public action" here shows an intent to exclude inverse condemnees from receiving relocation assistance benefits. The quoted section refers to a particular type of acquisition.

Second, in an inverse condemnation action, the public entity does take public action when it appropriates private land for public use. Without any "public action," i.e., a "taking" or "damaging" by a public entity, there would be no inverse condemnation cause of action.[6]

VI

The Imperial Irrigation District argues there is California authority for the proposition no "acquisition" occurs under the Act unless a public agency *actively* seeks to obtain possession of the property. Neither of the two cited cases (*Stephens* v. *Perry* (1982) 134 Cal.App.3d 748 [184 Cal.Rptr. 701]

---

[5]For example, under the Eminent Domain Law (Code Civ. Proc., § 1230.010 et seq.), the public entity must notify the property owner of its intent to acquire (§ 1245.235), must hold a hearing (§ 1245.235, subd. (c)), must adopt a resolution of necessity (§§ 1240.040, 1245.220) and file a complaint (§ 1250.110).

[6]See also Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 438. Professor Van Alstyne has observed that even when damages from a public improvement are foreseeable, a balancing process occurs relating the practicability of preventive measures and the costs of prevention. He states: "The governmental decision to proceed with the project without incorporating the essential precautionary modifications in the plan thus represents more than a mere determination that effective damage prevention is not expedient. It is also a *deliberate policy decision* to shift the risk of future loss to private property owners rather than to absorb such risk as a part of the cost of the improvement paid for by the community at large. In effect, that decision treats private damage costs, anticipated or anticipatable, but uncertain in timing or amount or both, as a deferred risk of the project. If and when they materialize, however, the present analysis suggests that those costs should be recognized as planned costs inflicted in the interest of fulfilling the public purpose of the project and thus subject to a duty to pay just compensation." (*Id.* at pp. 491-492, italics added, fn. omitted.)

and *Baiza* v. *Southgate Recreation & Park Dist.* (1976) 59 Cal.App.3d 669 [130 Cal.Rptr. 836]) so hold.

Both cases involved tenants whose possession was terminated by operation of the terms of the tenancy (failure to pay rent in *Baiza,* expiration of a lease in *Stephens*), not by the public entity's acquisition of property for a public use. Neither of those tenants came within the Act's definition of "displaced persons."

The Imperial Irrigation District also cites two federal cases (*Caramico* v. *Secretary of the Dept. of Hous. & Urb. Dev.* (2d Cir. 1974) 509 F.2d 694 and *Alexander* v. *U.S. Dept. of H. & U. Development* (7th Cir. 1977) 555 F.2d 166, affd. 441 U.S. 39 [60 L.Ed.2d 28, 99 S.Ct. 1572]) for the proposition relocation benefits are not available for "involuntary" or "random acquisitions" or unless the public entity takes "'conscious' public action." These cases both involve narrow interpretations of federal law in situations not comparable to the instant case and are thus distinguishable.

## VII

The Imperial Irrigation District also contends there is a distinction between an "acquisition," the term used in the Act and a "taking," a term used in inverse condemnation cases. The District states: "[T]he terms 'acquire,' 'acquisition' and 'acquiring' appear scores of times throughout the provisions of the Eminent Domain Law [but] . . . these terms are never used in any of the statutes related to inverse condemnation actions [E.g., Code Civ. Proc., § 1036; Gov. Code, § 905.5]."

The District's argument is unpersuasive. While it is true not all "takings" in inverse condemnation cases result in an acquisition of property by the public entity (see, e.g., *Orme* v. *State of California* ex rel. *Dept. Water Resources, supra,* 83 Cal.App.3d 178; *Shaeffer* v. *State of California, supra,* 3 Cal.App.3d 348, 352), the terms are not mutually exclusive.

Black's Law Dictionary (5th ed. 1979) defines "eminent domain" as "The power to *take* private property for public use . . . ." (Italics added.) Both the California and United States Constitutions as well as case law use the word "taking" in the context of eminent domain as well as inverse condemnation. (See *Baker* v. *Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d 862, 866, 867; *City of Oakland* v. *Oakland Raiders* (1982) 32 Cal.3d 60, 69 [183 Cal.Rptr. 673, 646 P.2d 835, 30 A.L.R.4th 1208]; *County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 687 [119 Cal.Rptr. 491, 532 P.2d 139]; *S. F., A. & S. R. R. Co.* v. *Caldwell* (1866) 31 Cal. 367, 372; *Gunter* v. *Geary* (1851) 1 Cal. 462, 464.)

Moreover, in *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d 914, 962, we used the word "acquire" in the context of an inverse condemnation action. ("It is well settled in an inverse condemnation case where there has been found a taking, the public entity *acquires* an interest in the property in return for the payment of damages." (Italics added.)

VIII

The intent not to exclude inverse condemnees from receiving relocation assistance is further shown by the legislative history.

The Legislature adopted the California Relocation Assistance Law in response to federal legislation (Uniform Relocation Assistance and Real Property Acquisition Policies for Federal and Federally Assisted Programs [42 U.S.C. §§ 4601-4655]) prohibiting federal financial assistance for state programs or projects unless the state had provided for relocation assistance and payments to persons displaced by those programs and projects. (42 U.S.C. § 4630; *Relocation Assistance In California: Legislative Response To The Federal Program* (1972) 3 Pacific L.J. 114 (hereafter *Relocation Assistance*).) Congress's declared purpose in enacting the Uniform Relocation Assistance Act was ". . . to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." (42 U.S.C. § 4621.) Congress defined a "displaced person" as ". . . any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622(a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project." (42 U.S.C. § 4601(6).)

Before adoption of the state Act in 1971, California provided for relocation assistance to displaced persons only in a limited number of circumstances. Such assistance was then available if a person was displaced by a redevelopment agency taking land for a redevelopment project (Health & Saf. Code, § 33415); a housing authority taking land for a housing authority project (Health & Saf. Code, § 34330); the San Francisco Bay Area Rapid Transit District (former Pub. Util. Code, § 29111, see Stats. 1966, ch. 165, p. 732);

a public entity taking land for airport expansion and development (former Pub. Util. Code, § 21690.6, see Stats. 1969, ch. 1228, p. 2377); the Los Angeles International Airport taking for airport expansion and development (former Pub. Util. Code, § 21690.20, see Stats. 1969, ch. 942, p. 1885); a public utility in a county with a population of more than four million persons (Pub. Util. Code, § 600); the Department of Public Works taking land for highway development (former Sts. & Hy. Code, § 158.1) and a public entity in a county with over four million persons taking land for a public use (§ 7260). (See *Relocation Assistance, supra,* at p. 117.)

In responding to the federal act, the California Legislature chose to extend relocation benefits beyond those required by Congress. Assemblywoman Yvonne Brathwaite's intent in introducing the Assembly Bill containing the relocation assistance provisions was to assure compliance with the federal act, to provide a uniform policy of relocation assistance to all condemnees within the state (not just condemnees who were displaced by a federal or federally assisted project) and to guarantee fair and equitable relief to condemnees for the costs and hardships incident to having their property taken. (*Relocation Assistance, supra,* at p. 118.)

In framing the definition of "displaced person," the California Legislature rejected the narrow definition used in the federal act. The federal act limits the definition of a displaced person to ". . . any person who . . . moves from real property . . . as a result of the acquisition of such real property, . . . or as the result of the written order of the acquiring agency to vacate . . . *for a program or project undertaken* by a Federal agency, or with Federal financial assistance; . . ."[7] (42 U.S.C. § 4601(6).) By limiting

---

[7]The vast majority of states use the language "for a program or project undertaken" in their definition of a "displaced person," either expressly (see Alaska Stat. § 34.60.150, subd. (2); Ark. Stat. Ann. § 14-1001; Colo. Rev. Stat. § 24-56-102, subd. (2); Conn. Gen. Stat. Ann. § 8-267, subd. (3); Iowa Code Ann. § 316.1, subd. 2; La. Rev. Stat. Ann. § 38:3101, subd. (3)(a); Ky. Rev. Stat. Ann. 56.630, subd. (3); Mass. Gen. Laws Ann. ch. 79A, § 1; Miss. Code Ann. § 43-39-5, subd. (c); Mont. Code Ann. § 70-31-102, subd. (4); N.M. Stat. Ann. § 42-3-2, subd. C(2); N.C. Gen. Stat. § 133-7, subd. (3); N.D. Cent. Code § 54-01.1-02, subd. 3; Ohio Rev. Code Ann. tit. 1, § 163.51, subd. (E); Okla. Stat. Ann. tit. 63, § 1086, subd. 3; Pa. Stat. Ann. § 35-1700-11 [refers to "a federally assisted governmental program"]; Tenn. Code Ann. § 13-11-103, subd. 5; Utah Code Ann. § 57-12-3, subd. (3) [Utah's statute uses the language "for a program of purchase undertaken by an agency or as a direct result of code enforcement activities or a program of rehabilitation of buildings . . . ."]; Va. Code Ann. § 25-238, subd. (c) [Virginia expressly excludes persons who voluntarily negotiate a sale under no threat of condemnation in § 25-236, subd. B]; Wash. Rev. Code Ann. § 8.26.020, subd. (4); see also The Uniform Eminent Domain Code, Art. XIV Relocation Assistance, § 1402, subd. (1), p. 152) or by implication, e.g., authorizing the adoption of regulations sufficient to comply with the Federal Act (see Ala. Code § 11-80-2; Kan. Stat. Ann. § 58-3501; Md. Transp. Code Ann. § 8-503; Mich. Comp. Laws Ann. § 252.131; Mo. Ann. Stat. § 100.390, subd. (8) (Vernon); Neb. Rev. Stat. § 39.1320, subd. (n); Nev. Rev. Stat. § 408.443; N.H. Rev. Stat. Ann. § 124.10; N.Y. High. Law

relocation assistance under the federal act to persons forced to move by a federal "program or project," it is clear Congress contemplated limiting benefits to those persons displaced by government initiated action, i.e., eminent domain or negotiated purchase.

Significantly, the California Legislature, having the federal act before them, did not adopt Congress's language of "a program or project undertaken" by the government, but instead broadly defined a "displaced person" as "any person who moves from real property . . . as a result of the acquisition of such real property . . . by a public entity . . . for public use." (§ 7260, subd. (c).) This language is broad enough to include certain inverse condemnees within its scope.

---

§§ 29, 30 (McKinney); S.C. Code Ann. § 28-11-10; S.D. Codified Laws Ann. § 5-2-18; Tex. Prop. Code Ann. § 21.046; Vt. Stat. Ann. tit. 19, § 2102; W. Va. Code § 54-3-3).

States which vary from the federal language of "for a program or project undertaken" include Arizona (Ariz. Rev. Stat. Ann. § 11-961, subd. 3: "any person in lawful occupancy who, . . . moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as a result of a written order of the acquiring agency to vacate real property acquired *for public purposes* . . . ." [italics added]); Hawaii (Hawaii Rev. Stat. § 111-2, defining a displaced person as a person who moves "as a result of the acquisition or imminence of acquisition of such real property, in whole or part, by a state agency or who moves from such real property as a result of the *acquisition or imminence of acquisition* by such state agency of other real property . . . ." [italics added]); Indiana (Ind. Code Ann. § 8-13-18.5-2, subd. (d), which includes language referring to a move "by reason of the partial acquisition of real property to the extent that *continued use* thereof by the owner or occupant *is rendered impossible or impracticable*, or as the result of the written order of the acquiring agency to vacate such real property intended to be acquired by the agency, . . ." [italics added]); Maine (Me. Rev. Stat. Ann. tit. 1, § 952, subd. 1: "any individual or entity who moves from a dwelling or place of business as a result of the acquisition, in whole or in part, of any interest in the land or the structure on which or in which that dwelling or place of business is located *for a public use project* . . . ." [italics added]); Minnesota (Minn. Stat. Ann. § 117.50, subds. 3, 4, defining "displaced person" as a person who moves "as a result of acquisition undertaken by an acquiring authority" and defining "acquisition" as including acquisition by eminent domain, negotiation, programs of areawide systematic housing code enforcement and demolition); New Jersey (N.J. Stat. Ann. § 52:31B-3, subd. (e): "'displaced' shall mean *required to vacate* any real property, or any tenancy therein, *pursuant to any lawful order* or notice of any State agency or unit of local government on account of the acquisition of any real property *for a public use,* or on account of a program of law enforcement, or on account of a program or project for the voluntary rehabilitation of dwelling units." [italics added]); Oregon (Or. Rev. Stat. § 281.045, subd. (1), defining displaced person as one who moves "as a result of: [¶] (a) [*a*]*cquisition* of the real property, in whole or in part, *by a public entity;* or [¶] (b) [r]eceipt of a written order by such person from a public entity to vacate the property *for public use*" [italics added]); Rhode Island (R.I. Gen. Laws § 37-6.1-9, subd. (3), including a person who moves "as a result of the *acquisition or reasonable expectation of acquisition* of such real property . . . ." [italics added]); and Wyoming (Wyo. Stat. § 16-7-102, subd. (iii), includes "any person who moves from real property, or moves his personal property from real property, *is removed from real property or loses title to real property,* as a result of the acquisition of all or part of the real property, or as the result of the written order of an acquiring agency to vacate real property for a program or project undertaken by the agency" [italics added]).

The Legislature's concern about inverse condemnees when it was adopting the relocation assistance provisions, is also reflected in section 7267.6. Section 7267.6 provides: "If any interest in real property is to be acquired by exercise of the power of eminent domain, the public entity shall institute formal condemnation proceedings. No public entity shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property."

■ The thrust of an inverse condemnation is proving a taking of real property has occurred. While section 7267.6 does not provide an independent basis for a separate cause of action or right to money damages (*Taper* v. *City of Long Beach, supra,* 129 Cal.App.3d 590, 594-595, fn. 1; *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 958 [162 Cal.Rptr. 210], cert. den. 449 U.S. 901 [66 L.Ed.2d 131, 101 S.Ct. 271]), it does provide a guideline for public entities (see *Tilem* v. *City of Los Angeles* (1983) 142 Cal.App.3d 694, 705 [191 Cal.Rptr. 229]; *Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d 934, 958). It also provides a strong statement of policy condemning a public entity's conduct in making it necessary for a property owner to institute an inverse condemnation action. Given this expression of policy of concern for property owners forced to bring an inverse action to establish a taking, it would be anomalous to conclude the Legislature did not intend to provide relocation assistance to at least some inverse condemnees, i.e., that the Legislature on the one hand would seek to prevent landowners from being forced to bring inverse condemnation actions, but on the other hand would deny relocation assistance to those same persons, thus encouraging public entities to force inverse condemnation actions as a cost savings measure.

Further, in the same legislation which adopted the relocation assistance provisions (Stats. 1971, ch. 1574, p. 3153), the Legislature also enacted Code of Civil Procedure section 1246.3 (now Code Civ. Proc., § 1036) which provides for an award of litigation costs and fees to a successful plaintiff in an inverse condemnation action. This provision was also compelled by the federal act. (See *Parker* v. *City of Los Angeles, supra,* 44 Cal.App.3d 556, 566.)

Thus, in enacting the state Act, it cannot be said the Legislature did not contemplate inverse condemnees' entitlement to relocation assistance benefits. Rather, the legislative history and the language of the Act suggest the Legislature was concerned about the hardships faced by an inverse condemnee forced to move by a taking by a public entity and intended to provide relocation assistance. Such an intent is shown by the fact the Legislature rejected the narrow federal language limiting relocation assistance to persons displaced as a result of planned government programs and projects but chose

broad language which could include inverse condemnees, the fact the Legislature condemned public entity conduct forcing landowners to bring inverse actions and the fact the Legislature in the same legislation providing for relocation assistance also sought to address another hardship borne by inverse condemnees by providing for the award of litigation costs and fees. Had the Legislature intended to exclude all inverse condemnees from receiving relocation assistance benefits, they easily could have done so, either by adopting the language of the federal act or other such similar limiting language. But, the Legislature did not. It adopted a broad definition of displaced persons and it included no language in the Act expressly excluding inverse condemnees from receiving relocation benefits.

Moreover, the Legislature in 1974 was presented with the question whether relocation assistance should be limited to direct condemnation situations by being included within the new Eminent Domain Law.

In 1965, the California Legislature directed the California Law Revision Commission to make a report recommending a comprehensive eminent domain law. (Stats. 1965, res. ch. 130, p. 5289.) The commission exhaustively studied condemnation law and procedure and in 1974 issued its recommendation. (12 Cal. Law Revision Com. Rep., Recommendation Proposing the Eminent Domain Law, *supra*, at p. 1601 et seq.) The proposed Eminent Domain Law was intended to "constitute a complete and well organized compilation of the law and [to] provide one uniform statute applicable to all condemnors and all condemnation proceedings." (*Id.* at p. 1628, fn. omitted.) The commission noted enactment of its proposed Eminent Domain Law would "permit the repeal of approximately 125 sections and the amendment of approximately 150 sections to delete more than 28,000 words of unnecessary language." (*Ibid.*, fn. omitted.)

The commission specifically addressed whether the relocation assistance provisions should be included within the Eminent Domain Law. They concluded it should not be. The commission stated: "The relocation assistance provisions of Government Code section 7260 *et seq.* should not be made a part of the eminent domain statute. The relocation assistance provisions are applicable to acquisitions of property by public entities by any means including eminent domain. They provide compensation for losses of a different character than those covered by the eminent domain statute. The Eminent Domain Law is so drafted that it does not duplicate any item of compensation provided by the relocation assistance provisions. Rather, it covers areas not covered by the relocation assistance provisions; in cases of possible overlap, compensation is paid only once." (*Id.* at pp. 1653-1654, fn. omitted.)

The Legislature adopted the commission's recommendation; the relocation assistance provisions were not made part of the Eminent Domain Law.[8] While part of the reason may have been the different character of the loss (i.e., moving expenses v. "just compensation"), it may also be inferred the Legislature did not include the relocation assistance provisions within the Eminent Domain Law because they did not want to limit the availability of the benefits to the eminent domain situation, i.e., that the Legislature intended as did the commission that the provisions would be applicable to "acquisitions of property by public entities *by any means* . . . ." (Italics added.)

We note further that the Eminent Domain Law contains provisions addressing acquisitions by sale, e.g., stating the public entity may proceed by purchase (Code Civ. Proc., §§ 1240.130, 1240.240) and requiring a public entity to include in its "resolution of necessity" (a prerequisite to initiating eminent domain proceedings) a statement of compliance with section 7267.2, e.g., that it has attempted to negotiate a purchase of the property (Code Civ. Proc., § 1245.230). In light of these provisions, an argument the Legislature intends relocation assistance to be available only to persons displaced as a result of government initiated acquisitions by not including the relocation assistance provisions within the Eminent Domain Law to only allow the provisions to cover an acquisition by negotiated purchase rather than just by eminent domain, is unpersuasive.

## IX

Another rule of statutory construction compels the conclusion relocation assistance is available to some inverse condemnees.

■ The court must construe statutes, if their language permits, so as to render them valid and constitutional rather than invalid and unconstitutional. (*Erlich* v. *Municipal Court* (1961) 55 Cal.2d 553, 558 [11 Cal.Rptr. 758, 360 P.2d 334].) Where a court, by the terms of the statutes and by a fair, reasonable interpretation, can arrive at a meaning consistent with the requirements of the Constitution, then the statutes should be given that

---

[8]The drafters of the Uniform Eminent Domain Code included relocation assistance within the code as article XIV, but explained: "[A]s Section 1402(1) makes clear, this Article applies with respect to any acquisition of real property, whether by eminent domain or by negotiated purchase. The term 'condemnors' is used to limit the Article to public entities and to private agencies that are generally authorized to exercise the power of eminent domain. [Citation.] However, nothing in this Article limits its application solely to displacements caused by a project for which the power of eminent domain *is* or *could* be used. Acquisitions for which eminent domain is not available or, if available, is *not* used, are also covered." (13 West's U. Laws Ann. (1980) Eminent Domain Code, § 1401, com., p. 131 (original italics).)

meaning rather than another meaning or construction which would conflict with the Constitution. (*County of Los Angeles* v. *Legg* (1936) 5 Cal.2d 349, 353 [55 P.2d 206]; *San Dieguito Union High School Dist.* v. *Rosander* (1985) 171 Cal.App.3d 968, 977 [217 Cal.Rptr. 737].) Statutory interpretations which eliminate doubt as to the constitutionality of statutory provisions are favored. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].)

If the relocation assistance provisions are construed so as to exclude inverse condemnees whose actions are a substitute for a direct condemnation action, a question immediately arises concerning constitutionality of the provisions under the equal protection clauses of the California and United States Constitutions.

■ The courts review statutes which do not touch on fundamental interests to see if the classification bears a rational relationship to a legitimate state purpose. (*Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942, 951-952 [104 Cal.Rptr. 297, 501 P.2d 537].)

The Imperial Irrigation District advances a number of arguments why the Legislature might have chosen to treat direct and inverse condemnees differently in providing relocation assistance.

The Imperial Irrigation District argues the federal act did not require the state to extend benefits beyond federally assisted programs to those displaced by inverse condemnation. However, the state did extend benefits beyond the federal act: to all persons displaced by an acquisition by a public entity for public use. An assertion of what the state might have done does not address the question here.

It has been held the Legislature may extend relocation assistance to persons displaced by only some government programs without offending the equal protection clause. In *Parking Authority* v. *Nicovich* (1973) 32 Cal.App.3d 420 [108 Cal.Rptr. 137], a case arising before the effective date of the 1971 relocation assistance provisions, the court held there was no equal protection violation involved when plaintiffs who were displaced when their land was condemned for parking purposes were denied relocation expenses while other persons displaced by other public entities were entitled to relocation expenses by statute. The court justified the unequal treatment by noting the problem of displaced persons "may have had to be attacked piecemeal" by

the Legislature and seemed a form of "disaster relief," a response to specific instances of large scale dislocations.[9] (*Id.* at p. 427.)

Such rationales have no place in today's statutory scheme. Now the Legislature intends to provide relocation assistance on a comprehensive basis, not just as situations arise. Thus, the justifications of *Parking Authority* v. *Nicovich, supra,* 32 Cal.App.3d 420, are no longer persuasive.

The Imperial Irrigation District argues such benefits might not have been thought to serve the stated legislative purposes of encouraging negotiated acquisitions and discouraging litigation. If this was the Legislature's thinking, then it was irrational. Provision of benefits to inverse condemnees encourages settlement by giving public entities and property owners a further incentive to settle rather than litigate moving expenses on a tort theory and gives public entities a further disincentive to allow inverse condemnation litigation.

The Imperial Irrigation District argues the Legislature might have concluded the provision of such benefits to inverse condemnees would not serve the goal of uniformity among government programs for which property is acquired. We fail to see how inverse condemnees who are the victims of intentional governmental action in taking their land does not further the goal of uniformity among governmental programs.

The Imperial Irrigation District argues the Legislature might have concluded providing relocation benefits for any unintentional taking would impair public agencies' ability to plan financially, and increase costs of government without corresponding social benefits. First, we note, the cost of relocation assistance to an inverse condemnee is relatively small compared to "just compensation." Second, we are not stating relocation assistance should be available to all plaintiffs who can frame their action as an inverse condemnation action; rather we address inverse actions which are a substitute for direct condemnation. For example, in the instant case, the Imperial Irrigation District planned to use the plaintiffs' land for storing its excess

---

[9]The court noted: "It is a matter of common knowledge, and hence of judicial notice, that highway construction (such as the Hollywood Freeway), and redevelopment (such as that on Bunker Hill, Los Angeles) resulted in the displacement of thousands of persons from dwellings and business establishments, both tenants and landowners. Eminent domain awards, depleted by costs of moving and relocation, were insufficient to supply those displaced with equivalents of the properties from which they had been displaced. Often, this was entirely unavailable. A natural disaster, perhaps, could not have created more personal havoc. Construed together, the provisions of Government Code sections 7260 through 7264 obviously are concerned with this 'disaster relief' rather than eminent domain, for section 7272.5 is clear that no new elements of damage in eminent domain are created thereby." (*Parking Authority* v. *Nicovich, supra,* 32 Cal.App.3d 420, 427.)

irrigation waters, going so far as to obtain "easements" to flood the property.[10] Under such circumstances, the Imperial Irrigation District, having planned to take the property eventually, could likewise plan for the cost of relocating the people it was planning to displace. A classification based on an inability to plan on the financial cost of such benefits in such circumstances appears irrational.

Moreover, the Legislature in providing for relocation assistance was concerned about the unfair burden placed on persons displaced by an acquisition for the benefit of the public as a whole, thus it appears the Legislature concluded the increased cost of providing relocation assistance had a corresponding social benefit. We cannot fathom how the social benefit is any less in the case of an inverse condemnee whose action is a substitute for direct condemnation or how inverse and direct condemnees may be rationally distinguished on this basis.

The Imperial Irrigation District argues the Legislature may have determined that since successful plaintiffs in inverse condemnation proceedings are already guaranteed payment for attorney's fees, engineering and appraisal fees and other types of litigation-related costs under section 1036 of the Code of Civil Procedure, unlike defendants in eminent domain proceedings, that such plaintiffs were adequately protected.

Initially, we note the Imperial Irrigation District is wrong when it states defendants in eminent domain proceedings are not entitled to litigation-related costs. An award of attorney's fees in an eminent domain proceeding may be awarded to a property owner when his or her demand was reasonable and the public entity's offer was unreasonable (Code Civ. Proc., § 1250.410) or when the public entity abandons the condemnation action (Code Civ. Proc., § 1268.610).

Second, we observe that, unlike a direct condemnee, an inverse condemnee is forced to bear the costs of litigation in order to receive his or her just compensation. A direct condemnee incurs litigation costs only when he or she disputes the right to take or the amount of just compensation, otherwise, there need be no litigation. Thus, it appears the provision of litigation costs to inverse condemnees in Code of Civil Procedure section 1036 shows an intent to put inverse condemnees on an equal footing with direct condemnees, not an intent to treat inverse condemnees differently.

Further, the motivating force behind providing relocation assistance was the conclusion condemnees were not being made whole through the payment

---

[10]These easements were held not to shield the Imperial Irrigation District from liability in *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d 914.

of "just compensation" (i.e., the fair market value of the property taken, but rather bore a disproportionate burden for a benefit to the public as a whole. (See 42 U.S.C. § 4621.) Congress, when adopting the Federal Act, observed: "In a less complex time, Federal and federally assisted public works projects seldom involved major displacements of people. . . . As the thrust of Federal and federally assisted programs have [*sic*] shifted from rural to urban situations, it became increasingly apparent that the application of traditional concepts of valuation and eminent domain resulted in inequitable treatment for large numbers of people displaced by public action. When applied to densely populated urban areas, with already limited housing, the result can be catastrophic for those whose homes or businesses must give way to public needs. The result far too often has been that a few citizens have been called upon to bear the burden of meeting public needs.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"[This legislation] recognizes that relocation is a serious and growing problem in the United States and that the pace of displacement will accelerate in the years immediately ahead." (H.Rep. No. 91-1656, reprinted in 1970 U.S. Code Cong. & Admin. News 5850, 5850-5852.) Certainly, there is no rational reason for providing relocation assistance to direct condemnees so that they do not bear a disproportionate burden for the benefit of the public as a whole while denying those same benefits to inverse condemnees who not only bear the same hardship but also bear the hardships of being forced to bring suit to recover the just compensation owed and of being forced to wait many years before receiving it.[11]

---

[11]The Supreme Court in Montana noted this same policy concern in *City of Three Forks* v. *State Highway Commission* (1971) 156 Mont. 392 [480 P.2d 826, 830], in deciding to affirm an award of damages in excess of fair market value in an inverse condemnation case without reference to statutory authority. The court stated: "When the State takes private property for a public use without just compensation having first been paid, the State has exercised its governmental power without proceeding in accordance with the procedure required by law, 'The effect of (Article III, sec. 14) is to waive immunity of the state where private property is taken or damaged for public purposes.' 3 Nichols on Eminent Domain 11, Note 15.1, citing Granone v. County of Los Angeles, 231 C.A.2d 629, 42 Cal.Rptr. 34.

"We affirm the measure of damages used in the case at bar. In accordance with the authority cited above, the trial court properly held that a state agency which takes property in violation of the Constitution, without prior judicial authority for the taking, should pay trespass damages in a suit by a landowner to recover for this illegal taking. If in such instance the landowner should receive only the value of the land taken and any dimunition in the remaining land, the State is thus liable only for the same amount as if it had brought a condemnation proceeding in accordance with the law. If that should be the holding, judicial condemnation proceedings required by the constitution are a useless formality, and at the same time the landowner is deprived of the additional compensation to which he is entitled for the violation of his constitutional property right to be free from unlawful trespasses and takings of his land, whether by the State or by private persons." (*Ibid.*)

The Imperial Irrigation District also argues the Legislature perhaps felt that adding the potential for relocation benefits for inverse condemnees might encourage frivolous claims and inverse cases. We find this argument unpersuasive. If inverse condemnees are not permitted to apply for relocation assistance benefits until there has been a final judgment holding the public entity has paid just compensation and permanently acquired the property, it can hardly be said the claim would be frivolous, rather it would have a substantial basis in law and fact.

The California Supreme Court has said direct and inverse condemnation "are merely different manifestations of the same governmental power, with correlative duties imposed upon public entities by the same constitutional provisions, . . ." (*City of Oakland* v. *Oakland Raiders, supra,* 32 Cal.3d 60, 67.) ▮ Once there has been a final judgment in an inverse condemnation action establishing just compensation and a permanent acquisition by the public entity, no practical distinction remains between the two actions; whether by judgment in inverse condemnation or by an eminent domain proceeding, the result is the same: an acquisition by the public entity for public use and the displacement of persons. Given the policy underlying the relocation assistance provisions—equitable treatment of persons displaced by public acquisitions for public use so they do not bear a disproportionate burden on behalf of the public as a whole—we see no rational basis for denying relocation assistance to persons forced to bring an inverse action because the public entity failed or refused to proceed by way of negotiated purchase or eminent domain. Therefore, in order to avoid an unconstitutional denial of equal protection, we conclude those inverse condemnees who are similarly situated to direct condemnees (i.e., those whose action is a substitute for a direct condemnation action) are entitled to relocation assistance benefits.

## X

▮ Finally, the Districts argue inverse condemnees are not entitled to relocation assistance benefits until there is a final judgment in inverse condemnation. We agree.

While it is true in an inverse condemnation action that the taking or acquisition of the property occurs before final judgment (indeed, before the litigation since it is the taking which prompts the inverse condemnation action), yet part of the burden a property owner bears in the action is establishing there has been, in fact, a taking. It would be anomalous to compel a public entity to pay relocation assistance benefits to a property owner while the public entity disputed whether a taking had occurred. An

application for relocation benefits before the acquisition or taking has been established would be premature.

## XI

In sum, we conclude those inverse condemnees who have successfully prosecuted an inverse condemnation action which is a substitute for a direct action and who have been displaced from their property by a public entity's appropriation or acquisition of their property are entitled to relocation assistance benefits under the Act.

To the extent the petitioners have not received a final judgment in their favor in inverse condemnation, an application for relocation assistance benefits is premature and therefore the judgment denying their petition for a writ of mandate is affirmed. As to the remaining petitioners, to the extent they have not settled, they are entitled to seek relocation assistance benefits under the Act and the writ should issue as to them.

The judgment is affirmed in part and reversed in part. The appellants to receive their costs.

Kremer, P. J., concurred.

**BENKE, J.**\*—I concur in what I perceive to be a very narrow holding: relocation assistance is available where a public entity has before it the choice of acquiring land for a public use and, rather than proceed by way of eminent domain or direct negotiation, intentionally elects to acquire the land by inverse condemnation. Such a holding is consistent with the legislative intent and public policies underlying the Relocation Assistance Act, and is directly supported by the express language in Government Code section 7260, subdivision (c).

A petition for a rehearing was denied November 24, 1986, and respondents' petition for review by the Supreme Court was denied January 14, 1987.

---

\*Assigned by the Chairperson of the Judicial Council.